UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| VERSUS | * | NUMBER: 17-241 |
| IRVIN MAYFIELD | * | SECTION: "A" |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT BASED ON DUE PROCESS VIOLATIONS AND GOVERNMENT MISCONDUCT IN GRAND JURY PROCEEDINGS AND <u>REQUEST FOR AN EVIDENTIARY HEARING</u>**

Defendant Irvin Mayfield, through undersigned counsel, respectfully moves this Honorable Court to dismiss the indictment in this matter and for a hearing on his motion for the following reasons:

### I.    INTRODUCTION

Following an investigation initiated by the Federal Public Defender's Office, the United States Attorney's Office for the Eastern District of Louisiana has admitted that it illegally leaked secret grand jury information to WWL-TV reporter David Hammer in clear violation of Federal Rule of Criminal Procedure 6(e), which forbids the Government to disclose matters occurring before a grand jury. The Government's actions constitute outrageous misconduct that not only violated federal law, but also calls into question the legitimacy of the grand jury proceedings used by the Government for years to target and investigate Mr. Mayfield and his co-defendant, Ronald Markham.

The Government has thus far refused to disclose the source of the leak or any other details about its misconduct, insisting that the issue will be handled as an internal disciplinary matter. Contrary to the Government's suggestion, Rule 6(e) violations are

exceptionally serious and have implications far beyond mere internal discipline. Such violations call into question the integrity of a grand jury's proceedings and the legitimacy of its indictment. Indeed, the proper functioning of the grand jury system depends on the secrecy of its proceedings. Accordingly, it is within this Court's supervisory powers to dismiss an indictment based on a Rule 6(e) violation. Additionally, this Court may dismiss an indictment when Government misconduct is so outrageous that a defendant cannot be prosecuted on the indictment consistent with due process.

Although outrageous in its own right, the disclosed illegal leak likely was not an isolated incident. Indeed, there is good reason to believe the Government may have funneled information to Mr. Hammer before. Notably, this particular U.S. Attorney's Office has a long history of engaging in similar misconduct, including strategically leaking confidential information to the media. Moreover, Mr. Hammer himself has engaged in a years-long, public campaign against Mr. Mayfield, and his well-documented statements throughout that period reveal that he has enjoyed reliable access to non-public information from various sources, including information about grand jury matters. Mr. Hammer has also been in contact with individuals who were likely grand jury witnesses and whose testimony may have been the basis for Mr. Mayfield's eventual indictment.

This disturbing pattern strongly suggests that the disclosed illegal leak is only the tip of the iceberg. A hearing is necessary to determine the full extent of the Government's misconduct, any impact on or interference with the grand jury proceedings, the consequences and damage suffered by Mr. Mayfield, and the appropriate remedy, including but not limited to dismissal of the indictment in this case.

## II.     BACKGROUND

For years, the Government has targeted and investigated Mr. Mayfield in connection with his leadership role on the board of the New Orleans Library Foundation, a private, non-profit organization that aims "to enrich New Orleans's people, culture, and economy by promoting literacy, supporting the New Orleans Public Library, and providing unique and accessible collections."[1] Specifically, the Government's investigation scrutinized how and why the Foundation's private funds were used to contribute to the construction and opening of the New Orleans Jazz Market, which is a multi-purpose space run by the New Orleans Jazz Orchestra and which housed a vast digital archives of music, scores, books, and periodicals related to New Orleans jazz history. Over the same period, Mr. Hammer conducted his own eerily parallel investigation, engaging in a sustained public campaign against Mr. Mayfield and alleging various types of criminal conduct.[2] Mr. Hammer's reports repeatedly included non-public information.[3]

---

[1] *See* "Mission" of the New Orleans Public Library Foundation, http://noplf.org/AboutUs.

[2] By undersigned counsel's cursory count, Mr. Hammer has published no less than 17 written articles and made at least 24 television appearances or broadcasts discussing Mr. Mayfield. Mr. Hammer has also attended a number of Mr. Mayfield's performances to demand comment from him, and has done the same at the University of New Orleans, Mr. Mayfield's place of employment. He has also gone to and repeatedly waited outside of Mr. Mayfield's home.

[3] *See, e.g.*, Exhibit A (David Hammer, "Sources: Feds investigating Library Foundation payments," WWL-TV, http://www.wwltv.com/news/local/investigations/david-hammer/sources-feds-investigating-library-foundation-payments_20160426062742726/153550985); Exhibit B (David Hammer, "Irvin Mayfield sent even more library money to Jazz Orchestra, records show," June 4, 2016, WWL-TV," http://www.wwltv.com/news/investigations/irvin-mayfield-sent-even-more-library-money-to-jazz-orchestra-records-show/244155249). Additionally, undersigned counsel has been in contact with an attorney who Mr. Hammer believed to be advising Mr. Mayfield about matters related to this case. That attorney told undersigned counsel that Mr. Hammer possessed information about the investigation that was not available to the public.

The Government's and Mr. Hammer's efforts culminated in a federal grand jury indictment against Mr. Mayfield and Mr. Markham on December 14, 2017. Following the grand jury's vote and pursuant to standard court procedure, the indictment was walked to the Magistrate Judge on duty, unsealed, and announced in open court. This procedure occurred before the Honorable Michael B. North, United States Magistrate Judge, at approximately 12:45 p.m. on December 14. Following the announcement, the indictment was transported to the Clerk of Court's Office to be formally filed, again, pursuant to standard court procedure. The indictment was timestamped by the Clerk of Court's Office as filed at 1:31 p.m. Thus, information about the grand jury's vote first became public at 12:45 p.m. and the paper filing memorializing the vote first became available approximately 45 minutes later. Prior to 12:45 p.m. on December 14, the grand jury proceedings were sealed and all matters related to those proceedings were subject to strict secrecy requirements under federal law.

Inexplicably, Mr. Hammer entered the Hale Boggs Federal Building at 11:11 a.m. on December 14, long before the Grand Jury's decision was unsealed and became public.[4] Shortly after entering the courthouse, Mr. Hammer spoke with an employee of the Clerk's

---

[4] The following timeline of events is based on a detailed, handwritten summary of courthouse surveillance footage provided to the Federal Public Defender's Office by the United States Marshal's Service. *See* Exhibit C. The summary was written by a courthouse security officer who personally viewed the footage. The Federal Public Defender has transcribed that handwritten timeline for convenience. Both are included in Exhibit C. The Federal Public Defender's Office has filed a Freedom of Information Act request to obtain the surveillance footage, but has not yet received a response.

Office.[5] He informed the employee that a "big indictment" was coming that day, eventually explaining that he knew that an indictment of Mr. Mayfield and Mr. Markham would be handed down by the grand jury shortly. The employee was understandably bewildered, as information about grand jury proceedings is strictly confidential and even he was not privy to such insider knowledge.

The courthouse's surveillance footage then shows that Mr. Hammer left the courthouse and walked toward the U.S. Attorney's Office across the street, as described in the timeline provided by the U.S. Marshal's Service, attached as Exhibit C.

Approximately 30 minutes later, Mr. Hammer returned to the courthouse and dutifully waited in the Clerk's Office for the indictment against Mr. Mayfield to be announced and filed. Mr. Hammer obtained a paper copy from the Clerk of Court the moment it became available. Minutes later, he broadcasted a "breaking news" report from a WWL-TV satellite truck apparently waiting outside of the courthouse. Mr. Hammer proudly waived the "first" copy of the indictment to his television audience and answered questions about the case posed by a news anchor in the WWL-TV studio.

Indeed, Mr. Hammer's report was in fact breaking news to everyone but Mr. Hammer and his news crew. Mr. Hammer even had a copy of the indictment before Mr. Mayfield and his counsel. That incident, combined with other known instances of Mr. Hammer possessing confidential information not available to the public, raised suspicions

---

[5] Undersigned counsel spoke with the court employee almost immediately after the employee's conversation with Mr. Hammer. The details about that conversation contained herein are those relayed to undersigned counsel directly by the court employee.

in the Federal Public Defender's Office that the Government might have engaged in a sustained pattern of unlawfully leaking confidential information to Mr. Hammer. Concerned, the Public Defender's Office immediately began to investigate the matter.

Following his December 14 broadcast at the courthouse, Mr. Hammer called undersigned counsel, seeking comment and an explanation for undersigned counsel's appointment to the case. Undersigned counsel declined to answer any of Mr. Hammer's questions. Instead, he asked Mr. Hammer how he knew that the grand jury would be voting to indict Mr. Mayfield. After a few awkward moments of silence and stuttering, Mr. Hammer responded with something to the effect of "I don't have to tell you who told me" or "I can't tell you who told me." Mr. Hammer's response betrayed that he had been leaked information about secret grand jury proceedings in violation of federal law.

Meanwhile, the Federal Public Defender's Office investigator contacted the United States Marshal's Service, seeking to preserve any surveillance footage of the courthouse that might show when and how Mr. Hammer gained access to confidential grand jury information. Representatives of the Marshal's Service told the Federal Public Defender's Office that they too recalled seeing Mr. Hammer in the courthouse long before information about the grand jury was made public and indicated that they shared the Federal Public Defender's concerns about an unlawful leak. The Marshal's Service warned that evidence of a leak would require the FBI to open a criminal investigation into the matter.

Unbeknownst to undersigned counsel, the Marshal's service immediately referred the matter to the FBI, specifically, to the case agent assigned to Mr. Mayfield's case. It appears that the FBI case agent then notified the U.S. Attorney's Office about the Federal

6

Public Defender's investigation. Upon learning of this, the Federal Public Defender was concerned about the Marshal's Service disclosure. He worried that turning over the leak investigation to the very individuals who may have perpetrated it was akin to putting the fox in charge of the hen house. Compounding that concern was this particular U.S. Attorney's Office's well-documented history with similar forms of misconduct and its proven inability to conduct diligent and neutral internal investigations into such matters.

On the afternoon of December 21, the U.S. Attorney's Office contacted undersigned counsel, requesting a private meeting in this Court's chambers. At the meeting, Government attorneys admitted to undersigned counsel and this Court that the U.S. Attorney's Office had in fact unlawfully leaked confidential grand jury information to Mr. Hammer. The attorneys would not reveal the details of the leak or the perpetrator. Despite this refusal to provide any concrete information about the misconduct, the attorneys insisted that the leak was merely a one-time event and that the U.S. Attorney's Office would treat it as an internal disciplinary matter. Government attorneys requested that any future filings discussing the misconduct be submitted to the Court under seal. Undersigned counsel refused to agree to those terms.

While no doubt outrageous, the Government misconduct in this case is unfortunately not shocking. The Office is infamous for leaks in high profile cases, including strategic leaks to the media. An appalling, non-exhaustive list of similar incidents was described in a motion to dismiss filed by Defendant Andre Hankton in *United States v. Howard*, No. 12-001-F, attached as Exhibit D. That list reveals a disturbing pattern of violations over many years, including a startlingly similar leak in the high profile Danziger

7

Bridge prosecution. One day before a defendant in that case, Michael Lohman, was scheduled to plead guilty and cooperate with the Government, the Associated Press reported the scheduled guilty plea, despite the case being under seal. At Mr. Lohman's re-arraignment, the Honorable Ivan L. R. Lemelle asked the U.S. Attorney's Office to conduct a criminal investigation into the leak, noting that the actions could constitute obstruction of justice. Despite Judge Lemelle's admonitions, there is no record of the Office ever investigating the misconduct. To the contrary, Government officials distributed copies of Mr. Lohman's Factual Basis at the courtroom door, demonstrating their apparent intention to strategically publicize information about the case to poison the atmosphere against the remaining defendants.

The Office's record of leaks additionally reveals that Mr. Hammer in particular is a favorite recipient of non-public grand jury information. For example, in the federal investigation of former Plaquemines Parish Sheriff Jeff Hingle, Mr. Hammer cited "sources close to the investigation" in several of his reports and not only detailed precisely what the FBI was targeting, but also who was wearing a wire during the investigation.[6]

Thankfully, there is no need to speculate about whether Mr. Hammer has enjoyed similar access to confidential information in this case. Mr. Hammer's pursuit of Mr. Mayfield—and his tendency to tout his own special access to insider information—has left a trail of other possible leaks. Mr. Hammer has also had contact with individuals who likely

---

[6] *See* Exhibits E and F.

testified before the grand jury, including former Foundation board members, such as Dan Forman and Gerald Duhon Jr.[7]

Mr. Hammer's well-documented involvement in this case, combined with the disclosed leak and a long history of other grave misconduct at this U.S. Attorney's Office, strongly suggests that December 14 was not the first time Mr. Hammer obtained unlawfully-disclosed information from the Government. The emerging pattern raises other concerns as well, such as the possibility of a coordinated effort to target Mr. Mayfield between Mr. Hammer and the Government or others connected with the investigation. To be sure, Mr. Mayfield has been effectively tried in the court of public opinion for years, long before much of the information about the investigation was publicly available and long before he was indicted by a grand jury or even represented by counsel.

Importantly, the foregoing information represents only what the Federal Public Defender's Office has been able to gather in the weeks since the indictment. Its investigation of this matter is ongoing and turns up new information almost daily. Thus, undersigned counsel respectfully requests permission to supplement the record with new arguments and information as it comes to light.

---

[7] *See* Exhibit G (David Hammer, "Mayfield's Library Foundation paid his Jazz Orchestra more than $1 million," Dec. 11, 2015, http://www.democratandchronicle.com/story/news/local/investigations/david-hammer/2015/12/11/mayfields-library-foundation-paid-his-jazz-orchestra-more-than-1m/77178812/).

### III.     ARGUMENT AND LEGAL AUTHORITIES

Rule 6(e) of the Federal Rules of Criminal Procedure formalizes an ancient and long-established protection that is essential to the integrity of our grand jury system. "The Supreme Court has consistently recognized that the proper functioning of the grand jury system depends upon the secrecy of its proceedings." *United States v. Sobotka*, 623 F.2d 764, 766 (2d Cir. 1980) (citing *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979)). Rule 6(e) implements this policy of secrecy by imposing strict confidentiality requirements on grand jury proceedings, such as requiring that all records, orders, and subpoenas relating to grand jury proceedings be sealed.

The rule also expressly prohibits an attorney for the government from "disclos[ing] a matter occurring before [a] grand jury." Fed. Crim. P. R. 6(e)(2)(B). While the rule permits government attorneys to make certain disclosures about grand jury matters to "government personnel," it also makes clear that "[a] person to whom information is disclosed" pursuant to that exception "may use that information only to assist an attorney for the government in performing that attorney's duty to enforce federal criminal law." Fed. R. Crim. P. 6(e)(3)(B). Moreover, "[a]n attorney for the government must promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made, and must certify that the attorney has advised those persons of their obligation of secrecy[.]" *Id.*

There is no question that the Government violated Rule 6(e). *See United States v. Howard*, 2014 WL 2429315, at *2 (E.D. La. May 29, 2014) (Feldman, J.) ("Disclosures regarding the names of witnesses, the subjects of an investigation, the nature of the crimes

10

or the number of persons to be charged, specific evidence presented, and *when the grand jury will return an indictment* are all prohibited." (emphasis added)). And, while the Government has thus far refused to disclose the source of the leak in this case (or any other details about its misconduct, for that matter), there has been no indication that the Government ever provided the impaneling court with names of government personnel to whom it disclosed confidential grand jury information. Thus, if the source of the leak was not a government attorney, the United States Attorney's office may have violated Rule 6(e) twice: first by failing to notify the impaneling court of the employee who received the information, and then again when that employee unlawfully disclosed the information to Mr. Hammer.

There is a clear avenue to relief when a Rule 6(e) violation like this one occurs. Normally, this Court may exercise its supervisory powers to dismiss an indictment based on a Rule 6(e) violation if the government's misconduct "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (internal citation and quotation marks omitted). However, Mr. Mayfield notes that a showing of prejudice in this case will be unnecessary. It is appropriate for this court to presume prejudice "where, for example, there exists a history of prosecutorial misconduct, spanning several cases, that is so systematic and so pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Howard*, 2014 WL 2429315, at *2 (internal citation and

quotation marks omitted). It is hard to imagine a clearer pattern of misconduct than the one present in this particular U.S. Attorney's Office.

Finally, the Government's conduct has Constitutional ramifications as well. Like the Federal Rules of Criminal Procedure, the Constitution guarantees certain protections for targets of government investigations. "In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct reach[ed] a demonstrable level of outrageousness." *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (alterations in original) (internal quotation marks and citations omitted). Moreover, "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). Improper use of the media by persons close to the judicial process has great potential to inflame the public and prejudice the rights of the accused by depriving them of the possibility of a fair trial. The Supreme Court has warned that neither prosecutors, counsel for defense, the accused, witnesses, court staff, nor law enforcement officers should be permitted to frustrate the trial court's function and that collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures. *Id*. at 362–63.

The Government has already confessed to outrageous and unlawful misconduct in connection with the grand jury proceedings in this case. And the Government's actions raise questions about whether it was coordinating attacks on Mr. Mayfield with members of the media. No doubt, if it was the Government's goal to poison the atmosphere against

12

Mr. Mayfield by trying and convicting him in the court of public opinion before ever having to submit a shred of evidence, it has certainly succeeded.[8]

## IV. REQUEST FOR AN EVIDENTIARY HEARING

It is beyond dispute that Mr. Mayfield has made a prima facie showing of a Rule 6(e) violation and is thus entitled to an evidentiary hearing on this matter. The Government should come to the evidentiary hearing prepared, at the very least, to answer the following questions:

- Who leaked the secret grand jury information to Mr. Hammer?
- What is the full extent and content of the communications between the leaker and Mr. Hammer?
- What was the means of communication between Mr. Hammer and the leaker and how did they come into contact with one another?
- Did Mr. Hammer initiate contact with the leaker or did the leaker contact Mr. Hammer?
- What other Government personnel have been in contact with Mr. Hammer and what is the full extent and content of those communications?
- What is the full extent and content of all communications about this case between Government personnel and members of the media?
- Have any Government personnel contacted Mr. Hammer or any other private third parties to plant information about the investigation in the media?
- Has Mr. Hammer, or any other unauthorized party, been in contact with any grand jurors or grand jury witnesses?
- What is the nature and extent of outside influences on the grand jury proceedings and indictment, including but not limited to witness testimony and juror deliberations?
- What Government personnel, beyond the attorneys directly involved in the proceedings, were privy to information about the grand jury?

---

[8] *See, e.g.,* Stephanie Grace, "Those who misuse donations for vital public services deserve a "special place" in prison," Dec. 16, 2017, *The Advocate* ("[T]here should be a special place in prison for someone who's convicted on charges like these. There should also be a special place somewhere else.").

- Why did Interim U.S. Attorney Duane Evans thank Rafael Goyeneche of the Metropolitan Crime Commission in the press release announcing the indictment in this case?

- Has anyone in the government communicated information to Mr. Goyeneche?

- What communications have occurred between Mr. Goyeneche and Mr. Hammer?

- What actions, specifically, has the U.S. Attorney's Office taken to root out and remedy this leak?

These questions are merely a starting point if there is to be a meaningful investigation into and remedy for the blatant misconduct in this case.

## V.   CONCLUSION

For the forgoing reasons, Mr. Mayfield respectfully requests that this Court dismiss the indictment based on Government misconduct and due process violations, and requests an evidentiary hearing on the matter.

Respectfully submitted this 4th day of January, 2018.

CLAUDE J. KELLY
Federal Public Defender


/s/Claude J. Kelly
CLAUDE J. KELLY
Federal Public Defender
Hale Boggs Federal Building
500 Poydras Street, Suite 318
New Orleans, Louisiana 70130
Telephone: (504) 589-7930
Bar No.   18074

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following: Dall Kammer, Assistant United States Attorney.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: n/a

/s/Claude J. Kelly
CLAUDE J. KELLY
Federal Public Defender