UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| VERSUS | * | NUMBER: 17-cr-241 |
| IRVIN MAYFIELD RONALD MARKHAM | * | SECTION: "A" |

**MEMORANDUM IN SUPPORT OF IRVIN MAYFIELD AND RONALD
MARKHAM'S MOTION TO RECONSIDER**

**NOW INTO COURT**, through undersigned counsel, come Irvin Mayfield and

Ronald Markham who respectfully request reconsideration of this Court's September 26,

2019 Order (ECF No. 216). Mr. Mayfield and Mr. Markham respectfully urge

reconsideration on the grounds that: (1) the prosecution improper conflated distinct

standards governing defendant subpoenas; (2) each of the documents requested plainly is

relevant to the scope of the evidentiary hearing under the clear standards announced in

*Caldwell*; and (3) limiting the defendants' access to information and compulsory process

in this manner threatens the integrity and fairness of the criminal process as a whole and

raises serious constitutional concerns. Undersigned counsel appreciates that the evidentiary

hearing for this matter is scheduled for tomorrow morning and therefore this Court may

wish to resolve the issues raised herein following the hearing.

## I.      The prosecution improperly conflated Rules 16 and 17.

As an initial matter, the prosecution confused Rules 16 and 17 in its briefing and in

its arguments at the September 26 hearing, causing this Court to apply *Nixon*'s "relevance"

standard where that standard had no application. Rule 16 governs defendant demands of

documents in the possession of the *government* and therefore is applicable to the first of the two subpoenas at issue. Under Rule 16, the government must permit access to items within the government's possession that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E); *Bowman Dairy Co. v. United States*, 341 U.S. 214, 219 (1951) ("Rule 16 deals with documents and other materials that are in the possession of the Government and provides how they may be made available to the defendant for his information"). Notably, Rule 16 is a general discovery device and was promulgated for that very purpose—namely, to "g[i]ve discovery as to documents and other materials otherwise beyond the reach of the defendant which, as in the instant case, might be numerous and difficult to identify. . . . This was a departure from what had theretofore been allowed in criminal cases." *Bowman Dairy*, 341 U.S. at 218–19. In other words, any requested document in the possession, custody, or control of the government need only be material to the defense to be discoverable.[1]

United States v. Nixon—the basis for the prosecution's motion to quash—need not apply to the U.S. Attorney's Office subpoena, because that case lays out the standards for *Rule 17*, not Rule 16. 341 U.S. 214 (1974). In addition to the rights provided in Rule 16, a defendant *also* has a right to subpoena witnesses and documents—a right assured by the Sixth Amendment's compulsory process guarantee and codified in Rule 17(c). *See* U.S. Const. Amend 6, cl. 3; Fed. R. Crim. P. 17(c). Unlike Rule 16, Rule 17(c) permits issuance of subpoenas to *non-parties* (i.e., witnesses) and may be used to direct the production of

---

[1] At the hearing, AUSA Carter held up an envelope containing the items requested, and, therefore, they clearly are within the possession, custody, and control, of the U.S. Attorney's Office.

documents possessed by those parties before trial. Fed. R. Crim. P 17(c)(1). The rule also provides subpoena power to the government, as illustrated by *Nixon* itself, and provides a second mechanism for a defendant to request documents from the government, as illustrated by *Bowman Dairy*.[2] *Nixon* laid out a four-factor test for Rule 17(c) subpoenas. Most prominent in the prosecution's argument in favor of its motion to quash—and the focus of this Court's inquiry at the September 26 hearing—was the first factor: whether the documents requested were "evidentiary and relevant." *Nixon*, 418 U.S. at 699.

As defense counsel noted at the hearing, many courts have questioned the applicability of *Nixon* outside the context of Rule 17(c) subpoenas issued *by or to the government*, and there are many good reasons to exercise caution when applying *Nixon* to *defendant* subpoenas issued to *third parties*, not the least of which is undue restraint on the Sixth Amendment right to compulsory process.[3] And, as discussed in the initial motion to suppress, there already is extensive evidence to support the conclusion that LLA is actually a part of the prosecution team and not an independent non-party—meaning, Rule 16 would be applicable to the LLA subpoena as well. But assuming LLA's independence from the U.S. Attorney's Office and FBI—and assuming *Nixon*'s applicability beyond the limited context of government-issued Rule 17(c) subpoenas—the question presented to this Court at the hearing was whether the limited documents requested in the LLA subpoena were

---

[2] In other words, the U.S. Attorney Subpoena needed to satisfy *either* Rule 16 standards *or* Rule 17 standards.

[3] For a comprehensive discussion of this issue and a broad overview of Rule 17(c), *see* Benjamin E. Rosenberg & Robert W. Topp, *The By-Ways and Contours of Federal Rule of Criminal Procedure 17(c): A Guide through Uncharted Territory*, 45 No. 2 Crim. Law Bulletin ART 1 (Spring 2009). *Nixon* itself also noted the possibility that Rule 17(c) subpoenas issued to third parties should not be subject to the same vigor as subpoenas issued to the government (in *Nixon*, the President). *See Nixon*, 418 U.S. at 699 n.12.

"evidentiary and relevant" to the scope of the evidentiary hearing for which they were sought.[4] Of course, considering the limited applicability of the Rules of Evidence at suppression hearings, the documents requested plainly were "evidentiary"—i.e., admissible. Therefore, only the question of relevance remained.

The standard applicable to the U.S. Attorney's Office subpoena was only whether the documents requested in that document were *material to preparing the defense*. Nonetheless, out of an abundance of caution, undersigned counsel provides a discussion of the *relevance* of the documents requested in *both* subpoenas—demonstrating that even strict, indiscriminate application of *Nixon* produces the same result for each of the two subpoenas and that the U.S. Attorney's Office subpoena is proper under either rule.

## II.  The limited information requested in the subpoenas plainly is relevant to the factors listed in *Caldwell*.

This Court specifically granted an evidentiary hearing "[i]n order to demonstrate under the standards discussed in *Caldwell* whether their recorded statements should be excluded at trial." Dkt. No. 191 at 19 ("Order"). Accordingly, any evidence "relevant" to the standards set forth in *Caldwell* is properly within the scope of the evidentiary hearing. Under *Caldwell*, statements like the ones elicited in this case are inadmissible when a defendant shows that "misrepresentations were made, and because of those misrepresentations [the defendant] attended the interview" at issue. 820 F. 2d 1395, 1399 (5th Cir. 1987). Central to this inquiry (indeed, half of it) is the question of whether the

---

[4] This Court noted at the hearing that it did not question that the subpoenas were issued in good faith, and the prosecution easily compiled its response in the manila envelope it held up at the hearing, dispensing of any arguments about burden or lack of adequate specificity.

questioning agent "made material misrepresentations *about the nature of the inquiry*." *Id*. (emphasis added). It is unsurprising, therefore, that the focus in *Caldwell*—and the district court hearing upon which that case is based—was the Court's examination of evidence relevant to determining the true nature and scope of the civil actor's inquiry, followed by a determination of whether the actor made material misrepresentations about that inquiry.

The following types of evidence and information were identified by the Fifth Circuit in *Caldwell* as relevant to those mandated questions. For each *Caldwell* factor listed, citation to specific Fifth Circuit language is provided, as well as a list of requested information relevant to that particular factor. As demonstrated, all of the information sought in the quashed subpoenas plainly relates to the factors identified as relevant by the Fifth Circuit. Indeed, the vast majority of the requested information is relevant to multiple (if not all) *Caldwell* factors.

**(1) The "real purpose" of each meeting and of the overall investigation**. *See, e.g.*, *Caldwell*, 820 F.2d at 1400 ("Both Bobbitt and Moranto testified that the *purpose of the meeting* was to investigate the 1979–80 tax years."); *id*. at 1400–01 ("In sum, we cannot conclude after examining the record that Bobbitt made a material misrepresentation by asking Caldwell to meet with him to discuss the 1979–80 audit. We agree with the district court that the *real purpose of this meeting* was not to conduct a criminal investigation of the 1978 tax year.").[5] The subpoenas sought the following information, which is relevant

---

[5] Oddly, at the hearing, AUSA Carter expressed confusion about counsel's use of the term "purpose" and suggested that McDougall's purpose was irrelevant. Of course, that exact term—and the inquiry it mandates—is central to the Fifth Circuit's analysis in *Caldwell* and is perhaps the most obvious theme running throughout the Court's decision. The purpose of McDougall's investigation—and his

to determining the "purpose" of the various meetings requested by LLA auditor Brent McDougall and the broader question of the true purpose of his overall investigation:

- All correspondence between any employee of the LLA and any employee of the FBI or USAO concerning the investigation of Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives during which those topics were discussed.[6]

- LLA's training manuals, investigative guidelines, and/or policy manuals.

**(2) The true reason for the initiation of civil agency's inquiry and, relatedly, the true reason for any referral of the matter to the civil agency.** *See, e.g.*, *Caldwell*, 820 F.2d at 1400 ("[W]e do not agree with Caldwell's statement that '[f]rom the outset, this was a criminal investigation. The matter had been referred by the Criminal Investigation Division of the IRS to determine whether there had been a criminal violation. . . .' The evidence is to the contrary. In the referral letter from CID to the civil division, the CID states, 'CID is reluctant to open a full-scale investigation and to reopen any tax year without more distinct evidence of fraud.'"); *id*. ("Caldwell contends that the CID referred the case to the civil division, which selected his 1979 return for examination, for the purpose of implementing the informant's tip that Caldwell possibly engaged in criminal tax violations."). The subpoenas sought the following information, which is

---

various actions in furtherance of that investigation—*must* be determined to figure out whether he made misrepresentations about the nature of his inquiry.

　　[6] Importantly, many of McDougall's interviews with the defendants occurred immediately following a USAO or FBI meeting, strongly suggesting a connection between McDougall's purpose in interviewing the defendants on those dates and the criminal investigation. Moreover, the government has produced only a single 302 and not all meetings are documented on McDougall's calendar, creating not only relevance, but necessity for these materials. Similarly, as discussed below and as specifically noted by the Court in its Order, the entanglement between McDougall and the criminal investigation is relevant to the *Caldwell* inquiry, making this requested evidence all the more relevant.

relevant to the questions of why the LLA initiated this investigation and why the matter was referred to LLA for investigation in the first place:

- All correspondence between the LLA and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and MCC representatives during which those topics were discussed.[7]

- All correspondence between the USAO and/or FBI and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives during which those topics were discussed.

- LLA's training manuals, investigative guidelines, and/or policy manuals.[8]

**(3) Whether any of the actors had a "firm indication of fraud" at the time of the referral of the case to the civil agency or at the time of the interviews in question.**

---

[7] Information about the MCC complaint and its role in both investigations is relevant because the prosecution itself asserted that "the LLA properly initiated an audit of NOJO after it received a complaint from the Metropolitan Crime Commission regarding NOJO's improper use of public funds. Gov't Opp. to Mot. to Suppress at 2; *see also* Gov't Mot. to Quash at 5 ("[T]he LLA received and acted upon a bona fide complaint from the Metropolitan Crime Commission.") In other words, the prosecution has identified the MCC complaint as the reason for the initiation of the purportedly civil LLA audit of NOJO funds. Under *Caldwell*, the reason for that MCC referral and the nature of the referral is relevant to determining whether the subsequent investigation it allegedly spawned was truly criminal or civil in nature. Therefore, the prosecution was incorrect when it made the later, contradictory claim that the MCC's "role in initiating the state audit is irrelevant." *See* Gov't Reply at 3. It plainly is relevant, because the prosecution has made it relevant.

[8] The prosecution specifically put at issue the normal practices and procedures of the LLA in its civil investigations to refute the suggestion that this was a criminal investigation instead of a normal civil audit. Policy and training manuals and guidelines plainly are relevant to *Caldwell*'s inquiry about whether the investigation exceeded the bounds of a normal LLA audit and also are commonly compelled evidence at suppression hearings, where normal investigative practice and allegations of a pretext are at issue. *See, e.g.*, *United States v. Charles*, No. 08-cr-0011, 2008 WL 5172587, at *3 (W.D. La. Dec. 9, 2008) ("The government's assertion that the manuals are irrelevant in a suppression hearing is also without merit. In *U.S. v. Doe*, 801 F. Supp. 1562 (E.D .Tex. 1992), cited by defendant, the policies of the police department regarding inventory searches was critical during a suppression hearing to whether or not the government would have inevitably discovered the evidence sought to be suppressed. Similarly, in the case at hand, where the credibility of the defendant and police officers must necessarily be assessed, the court can well envision that the occurrence of certain actions may be denied as against, or asserted and affirmed as in accordance with, departmental policy and procedure. Therefore, the undersigned finds that the subpoenaed policy and procedure manuals are relevant and necessary for effective representation by counsel.").

*See, e.g.*, *Caldwell*, 820 F.2d 1399, n.4 ("Bobbitt did not have firm indication of fraud before he actually referred the case, or at the time of the interview.). The subpoenas sought the following information, which is relevant to the question of whether McDougall, those who referred the matter to him, or others connected with his inquiry had "a firm indication of fraud" either at the time the matter was referred to him or at the time he interviewed the defendants:

- All correspondence between any employee of the LLA and any employee of the FBI or USAO concerning the investigation of Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives during which those topics were discussed.

- All correspondence between the USAO and/or FBI and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between MCC and USAO/FBI representatives during which those topics were discussed.

- All correspondence between the LLA and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and MCC representatives during which those topics were discussed.

- All administrative or grand jury subpoenas for financial records in this case.

**(4) The "purpose" of asking particular questions and whether those purposes linked to any investigation of "criminal acts."** *See, e.g.*, *Caldwell*, 820 F.2d at 1400 ("Bobbitt testified that *the purpose of asking the questions* relating to 1978 was to clarify questions he still had about Caldwell's connection with Great Lakes, *not to investigate criminal acts* occurring in 1978."). The subpoenas sought the following information, which is relevant to the question of whether McDougall asked various questions—most notably,

questions related to the NOPLF—in connection with the criminal investigation or merely

his purported civil investigation of use of public funds by NOJO:

- All correspondence between any employee of the LLA and any employee of the FBI or USAO concerning the investigation of Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives during which those topics were discussed.

- All correspondence between the LLA and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and MCC representatives during which those topics were discussed.

- LLA's training manuals, investigative guidelines, and/or policy manuals.

**(5) Why the agent "desired to interview" the defendant on the particular occasion of the defendant's statement and whether doing so was "part of an independent criminal investigation" rather than the purported civil investigation.**
*See, e.g.*, *Caldwell*, 820 F.2d at 1400 ("[W]e do not find any clear and convincing evidence that Bobbitt *desired to interview* Caldwell on July 28 *as part of an independent criminal investigation*."). The subpoenas sought the following information, which is relevant to the question of why McDougall sought meetings with the defendants when he did and whether he desired to interview the defendants with the purpose of advancing a separate criminal investigation or merely did so to advance his own purported civil inquiry into the use of public funds, and further is relevant to McDougall's meeting with the federal investigative team shortly before interviewing the defendants:

- All correspondence between any employee of the LLA and any employee of the FBI or USAO concerning the investigation of Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives

during which those topics were discussed.

**(6) Any evidence that the questioning agent was conducting a "clandestine criminal investigation" as opposed to a civil one**. *See, e.g.*, *Caldwell*, 820 F.2d at 1400 ("Nowhere in the [referral] letter, or anywhere else in the record, is there evidence that CID was requesting that the civil division conduct *a clandestine criminal investigation* for it."). The subpoenas sought the following information, which is relevant to the question of whether McDougall was gathering information to aid the criminal investigation or merely a standard civil audit of public funds:

- All correspondence between any employee of the LLA and any employee of the FBI or USAO concerning the investigation of Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives during which those topics were discussed.

- All correspondence between the LLA and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and MCC representatives during which those topics were discussed.

- LLA's training manuals, investigative guidelines, and/or policy manuals.

**(7) "[E]vidence of any attempt to control the civil investigation by the Criminal Investigation Division" or "evidence of concerted action on the part of either" the civil or criminal actor.** *See, e.g.*, *Caldwell*, 820 F.2d at 1399 n.4 ("The court also notes that there is no evidence of *any attempt to control the civil investigation by the Criminal Investigation Division*, nor is there any evidence of concerted action on the part of either division before the January 28, 1983 referral . . . ."). The subpoenas sought the following information, which is relevant to the question of whether McDougall's investigation—and

10

his efforts to advance it—were controlled by any actors connected with the criminal investigation or whether McDougall engaged in concerted action with any actors connected with the criminal investigation:

- All correspondence between any employee of the LLA and any employee of the FBI or USAO concerning the investigation of Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives during which those topics were discussed.

- All correspondence between the USAO and/or FBI and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and USAO/FBI representatives during which those topics were discussed.

- All correspondence between the LLA and MCC concerning Ronald Markham, Irvin Mayfield, NOJO, or NOPLF, and all notes taken during telephone conferences or meetings between LLA and MCC representatives during which those topics were discussed.

**(8) Credibility of the witnesses testifying to the above relevant information.** *See Caldwell*, 820 F.2d at 1400. Contrary to the prosecution's suggestions in its filings and at the hearing, McDougall's credibility is central to the *Caldwell* inquiry. The information above is relevant not only to the listed *Caldwell* factors but also relevant to this Court's determination of whether McDougall's claims in his affidavit—and his testimony at the evidentiary hearing—are credible.

Unquestionably, the above information all is relevant to *Caldwell*—indeed, it is the precise information identified by the Fifth Circuit as relevant. The prosecution may not want to provide that information to the defense, but the defense is entitled to it nonetheless. There was no basis to quash the two subpoenas under Rule 17(c) or otherwise.

11

**III.**      **Undue limitations on a defendant's access to subpoenas threatens the integrity and fairness of the criminal process as a whole and raises serious constitutional concerns.**

Quashing the subpoenas was inappropriate for a second reason as well: the prosecution now has successfully urged this Court to adopt an unduly narrow and exceptionally harsh view of a criminal defendant's access to compulsory process that violates the Federal Rules and the Constitution. A criminal defendant's ability to subpoena witnesses and documents is not a creature of the Federal Rules alone—that right is guaranteed by the compulsory process clause of the Sixth Amendment. *See* U.S. Const. amend. VI, cl. 3 ("In all criminal prosecutions, the accused shall enjoy the right...to have compulsory process for obtaining witnesses in his favor."). This constitutional right is codified in part in Rule 17(c).

Of course, the Constitution does not require perfect equalization of resources, but it does "recognize[] the awesome power of indictment and the virtually limitless resources of government investigators," and therefore "[m]uch of the Bill of Rights is designed to redress the advantage that inheres in a government prosecution." *Wardius v. Oregon*, 412 U.S. 470, 480 (1973) (Douglas, J., concurring). To effect these rights, a defendant *must* have the ability to obtain information and evidence in good faith, including through compulsory process. *See* U.S. Const. amend. VI, cl. 3. "[U]nlike the Government, the defendant has not had an earlier opportunity to obtain material by means of a grand jury subpoena." *United States v. Nachamie*, 91 F. Supp. 2d 552, 562–63 (S.D.N.Y. 2000). Not only that, but the government has access to search and seizure powers and the entirety of the "investigatory arm of law enforcement." *United States v. Tucker*, 249 F.R.D. 58, 60

12

(S.D.N.Y. 2008), *as amended* (Feb. 20, 2008). Defendants, by contrast, will be lucky to have access to a single investigator. And by the time a case lands on the desk of a defense attorney, "law enforcement has typically gathered substantial evidence relating to the alleged offense"—in this case, over one million pages of documents and years of grand jury proceedings. In other words, "[t]he government's ability to discover information is significantly broader than that of a defendant," making all the more important the few constitutional guarantees afforded to the defense. *Id.*

Those concerns of imbalance are particularly heighted in this case. Over the course of the prosecution's approximately six-year investigation and five-year grand jury inquiry, it has issued dozens of subpoenas to obtain more than one million pages of documents and, by the prosecution's own count, interviewed at least 80 witnesses, calling 25–30 to testify before the grand jury. The prosecution even took the extraordinary step of issuing subpoenas to the *already-indicted criminal defendants* in this case, demanding both documents and live testimony before a grand jury—a move that sparked extensive pre-trial litigation. The portions of those subpoenas that this Court left intact have been burdensome on Mr. Mayfield's two-attorney criminal defense team and have imposed strain on the already-limited resources of the Federal Public Defender's Office. These subpoenas also have permitted prosecution access to vast discovery power wholly denied to the defense.

In other words, the playing field in this case already is severely lopsided in favor of the prosecution. Immeasurable advantages of time, money, investigative tools and resources, and manpower all rest in the hands of the U.S. Attorney's Office. Of course, "[i]t is inherent in our criminal justice system that defendants will virtually always be

outmatched in investigatory resources, funds, and time to prepare for litigation." *Tucker*, 249 F.R.D. at 63. But, for white collar cases in particular, the imbalance is particularly extreme, more so for defendants who cannot afford counsel and must rely on public defense.[9] Although Rules 16 and 17 may not cure the severe resource and information-access imbalances (or come close), they nonetheless are critical, constitutionally-mandated tools necessary to counsel's ability to put on even a semblance of a defense, i.e., at least adequate representation of counsel in the face of goliath governmental action. Barring or unduly limiting access to those tools—or permitting burdensome government interference each and every time they are used—will seriously undermine the integrity of this entire criminal process and render it adversarial in name only.

The Court should reject the government's interference—now and going forward—in the defense's good faith efforts to obtain critical, necessary information and evidence that is material and relevant through the few means available to it, as are Mr. Mayfield and Mr. Markham's constitutional rights.

---

[9] Mounting a defense in the face of a white-collar prosecution is notoriously expensive for the accused. *See* Sarah Ribstein, *A Question of Costs: Considering Pressure on White-Collar Criminal Defendants*, 58 Duke L.J. 857, 859 (2009); Brief for Professor Shon Hopwood as Amicus Curiae in Support of Petitioner, *Lagos v. United States of America*, 138 S. Ct. 1684 (2018) (noting that "a white-collar criminal defense may well cost over a million dollars[, and] . . . . in some cases have cost as much as $30 or $40 million."). And white-collar defendants must do so in the face of staggering resources available to federal prosecutors, who, as the former United States Attorney for the Southern District of New York observed, enjoy access to a tax-payer funded "blank check" to investigate and prosecute those cases in particular. Preet Bharara, *Corporations Cry Uncle and Their Employees Cry Foul: Rethinking Prosecutorial Pressure on Corporate Defendants*, 44 Am. Crim. L. Rev. 53, 56 (2007).

**WHEREFORE**, for all of the foregoing reasons, Mr. Mayfield and Mr. Markham respectfully urge the Court to grant this motion for reconsideration.

Respectfully submitted, this 1st day of October, 2019.

CLAUDE J. KELLY
Federal Public Defender

/s/Celia C. Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender
500 Poydras Street, Suite 318
New Orleans, Louisiana 70130
Telephone: (504) 589-7930
Bar #NY5317185
e-mail: celia_rhoads@fd.org

*/s/Sara A. Johnson*
Sara A. Johnson (La. Bar No. 31207)
700 Camp Street
New Orleans, LA 70130
(504) 528-9500
sara@sarajohnsonlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following: Assistant United States Attorneys Dall Kammer, Brandon Long, and Theodore R. Carter, III, 650 Poydras Street, New Orleans, Louisiana 70130.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

/s/ Celia C. Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender