UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                      17-241

IRVIN MAYFIELD                              SECTION "A" (1)
RONALD MARKHAM

## ORDER AND REASONS

On October 2, 2019, the Court held an evidentiary hearing in conjunction with Defendants' **Motion to Suppress and Request for Evidentiary Hearing (Rec. Doc. 144).** The purpose of the hearing was to determine if oral statements made to a state employee in conjunction with a state audit should be suppressed at Defendants' federal criminal trial. (Rec. Doc. 191, Order and Reasons).

Prior to the hearing, Defendants filed a motion requesting that the Court reconsider **(Rec. Doc. 220, Motion to Reconsider)** its prior ruling (Rec. Doc. 216, Minute Entry ruling) on the Government's motion to quash Rule 17(c) subpoenas (Rec. Doc. 202, Motion to Quash).

Having considered the parties' exhibits, the extensive testimony elicited at the evidentiary hearing, the parties' memoranda, the arguments of counsel, and the applicable law, the Court DENIES both motions.

## Background

On December 14, 2017, a grand jury in the Eastern District of Louisiana indicted Irvin Mayfield and Ronald Markham charging conspiracy to commit wire fraud, mail fraud, and money laundering, wire fraud, mail fraud, money laundering, and obstruction

of justice. (CR17-241). As charged in the indictment, Mayfield founded New Orleans Jazz Orchestra ("NOJO") in 2002, and served as its Artistic Director. NOJO was composed of 18 musicians who routinely performed and toured, and it employed staff. (Rec. Doc. 78, Superseding Indictment ¶ 3). Both Mayfield and Markham received salaries from NOJO. Throughout NOJO's existence the organization relied heavily on donations and charitable grants to fund its operations. (*Id.* ¶ 5). In February 2011, a significant source of NOJO's funding was terminated. (*Id.* ¶ 6).

Mayfield also served as a board member and later chairman of the board of the New Orleans Public Library Foundation ("NOPLF"), a nonprofit that maintained a significant investment account. Markham also joined the board and succeeded Mayfield as chair. (*Id.* ¶¶ 8-11). The crux of the indictment is that when the funding for NOJO dried up, from August 2011 until about November 2013, Defendants transferred large sums of money from the NOPLF account and used it to fund NOJO and enrich themselves. (*Id.* ¶ 11). The indictment also charges Defendants with creating false and misleading business records in order to conceal their scheme from auditors, investment managers, and other NOPLF board members. A superseding indictment was returned on June 21, 2018. (Rec. Doc. 78). A second superseding indictment was returned on December 6, 2018, (Rec. Doc. 113), and it constitutes the current charging document.

The criminal trial in this matter is scheduled to commence on January 21, 2020. (Rec. Doc. 195).

## **Defendants' Motion to Suppress**

Via their motion to suppress, Markham and Mayfield sought to exclude at trial recorded statements made to an employee of the Louisiana Legislative Auditor's office

("the LLA") as well as certain documents provided to that agency during an audit. The statements and documents that the LLA gathered were turned over to the Government pursuant to a subpoena and are expected to be used against Defendants at trial. On June 25, 2019, the Court issued its Order and Reasons denying the motion to suppress as to the audit documents.[1] (Rec. Doc. 191, Order and Reasons at 16-17).

In that same Order and Reasons the Court explained why its greater concern was the recorded oral statements that both defendants willingly made to Investigative Auditor Brent L. McDougall (who works for the LLA) and which he secretly recorded. (*Id.* at 17). Defendants pointed out that they were interviewed extensively regarding the NOPLF funds at issue in the indictment and suggested that McDougall's questions went beyond the scope of what was arguably necessary to assist with the audit. Defendants contended that it was only through his role as a state auditor that McDougall was able to convince them to speak with him so candidly yet nothing about their dealings with McDougall suggested that he was cooperating with federal authorities. Defendants argued that it was only through deception and concealment that they consented to be interviewed by McDougall, and if they had known that McDougall was coordinating with federal authorities to investigate them personally they would not have consented.

In its Order and Reasons the Court explained why Defendants should be given an evidentiary hearing as to the oral statements. Because the governing legal principles drive the question of which facts are material to the suppression analysis, the Court also

_____

[1] The Court assumes the reader's familiarity with its first Order and Reasons pertaining to the Motion to Suppress (Rec. Doc. 191). That document contains a detailed factual background related to the LLA's audit.

provided the legal framework that would govern the admissibility determination. The Court explained that *United States v. Caldwell*, 820 F.2d 1395 (5th Cir. 1987), provides the proper analysis for whether the oral statements should be excluded at trial. (Rec. Doc. 191, Order and Reasons at 17). Defendants were granted an evidentiary hearing so that they could demonstrate under the standards discussed in *Caldwell* whether their recorded statements are inadmissible.[2] (*Id.* at 19).

The evidentiary hearing was held on October 2, 2019 (Rec. Doc. 221, Minute Entry). The matter was submitted on October 24, 2019, upon receipt of the parties' post-hearing memoranda.

_____

[2] The briefing that the parties submitted prior to the Court's first Order and Reasons did not create a distinction between the audit documents that Defendants sought to exclude and the recorded oral statements that they sought to suppress. In their briefing the parties focused in large part on *United States v. Blocker*, 104 F.3d 720 (5th Cir. 1997), which dealt solely with the inspection of corporate records under the Fourth Amendment. The *Blocker* decision makes no reference to oral recordings of the defendant in the case. If the Court had concluded that the LLA had violated Defendants' Fourth Amendment rights in conducting the audit, then Defendants' oral statements—made in conjunction with that audit—would likely have been suppressed without the need for a separate analysis. But having concluded that the LLA committed no Fourth Amendment violation in conjunction with the gathering and examination of the corporate documents (including those related to the NOPLF), the Court was persuaded nonetheless that Defendants' oral statements did not lend themselves to the same Fourth Amendment "search" analysis given the contention that the scope of the recorded interviews exceeded what might otherwise be mere "assistance" with the audit pursuant to La. R.S. § 24:513(E). As the Court explained, the admissibility determination for the oral statements in this case did not fall neatly within the scope of either the Fourth, Fifth, or Sixth Amendments. (Rec. Doc. 191, Order and Reasons at 17). But in *United States v. Caldwell, supra*, the Fifth Circuit adopted the "fraud, deceit, or trickery" analysis, which had previously been employed when analyzing consent to search audit documents under the Fourth Amendment, to determine whether statements willingly made at an audit interview should be suppressed. *Caldwell* and all of the cases that it relied upon involved audits performed by the Internal Revenue Service as opposed to a state auditor but the Court was persuaded that the *Caldwell* analysis fit remarkably well with the contentions being made in this case as to the oral statements. Because the Court ultimately concludes that Defendants have not met their heavy burden under *Caldwell*, the Court will not concern itself with whether *Caldwell* applies without modification when the civil audit at issue is conducted by a state employee as opposed to a federal agency like the IRS. That issue is now moot.

**Discussion**

Before proceeding to the oral statements, the Court reiterates with the benefit of having heard the testimony at the hearing, that this case does not present a situation where the Government initiated a sham civil audit that was a federal criminal investigation in disguise. The LLA received a bona fide complaint in June 2015 from the Metropolitan Crime Commission ("MCC") alleging questionable financial transactions by NOJO, an entity that receives public funds. The MCC requested that the LLA audit NOJO's finances, including "grants" from the financial accounts of the NOPLF to NOJO. MCC had sent a similar complaint to the FBI. Raphael Goyneche, MCC's President, testified regarding his efforts to have NOJO's finances investigated. Mr. Goyneche explained at the hearing that he was eager to have the LLA investigate his complaint because nothing seemed to be happening with the complaint that he sent to the FBI. Mr. Goyneche testified that he had never spoken to the lead prosecutor at the United States Attorney's Office until he received a subpoena to appear at the evidentiary hearing. Mr. Goyneche confirmed that no one with the Government had asked him to request that the LLA audit NOJO. The Court found Mr. Goyneche to be a credible witness.

As the Court explained in its Order and Reasons, the LLA had the statutory authority under state law to conduct the audit based on the MCC's request, and the commingling of public and private funds made the NOPLF funds fair game for the LLA's audit. McDougall explained at the hearing how public and private funds had been commingled at NOJO and the audit report discusses this commingling, which was extensive. (Government Exhibit 2 at 3). The LLA did not exceed the scope of the audit

authorized under state law by delving into the NOPLF transfers. McDougall credibly explained, from an auditing standpoint, why a proper audit of NOJO would necessarily have to include all of NOJO's funds, including the private NOPLF funds.

Simply, there is no evidence in this case that the LLA's audit was initiated at the request of the Government in order to assist with the federal criminal investigation. Special Agent Courtney Lantto testified that the FBI did not need the services of the LLA to investigate NOJO. Thus, this case is distinguishable from *United States v. Tweel*, *supra*, because in that case the purported civil audit was supposititious from its inception. *See United States v. Carriles*, 541 F.3d 344, 356 (5th Cir. 2008) (citing *Blocker*, 104 F.3d at 729) (discussing and distinguishing the audit in *Tweel*). In *Tweel* the civil audit had been undertaken solely at the behest of criminal investigators for the purpose of a criminal investigation. *Id.* at 357. That is not what occurred in this case.

Further, the fact that the MCC's audit request alluded to possible criminal activity did not deprive the audit of its civil nature under the Louisiana statutory scheme. In *Caldwell* itself, the civil audit had been triggered after a confidential informant had first reported possible fraudulent activity to the IRS's criminal division. 620 F.2d at 1397. Because the criminal division lacked sufficient evidence of fraud the matter was referred to the civil examination division for review. *Id.* The audit in this case was not a criminal investigation at its inception.

McDougall was assigned to work on the audit by his superiors at the LLA. The Court found credible both McDougall's and Special Agent Courtney Lantto's testimony that it was McDougall who initiated contact with the FBI in February 2016 for the purpose of ensuring that the audit would not be duplicating the work that the FBI was

doing as part of its own investigation. McDougall contacted the FBI after his supervisor told him to do so.

Even though the LLA's audit was not a sham and it was not initiated as a federal criminal investigation, McDougall entangled himself with the federal criminal investigation while executing his legitimate duties as a state auditor. It is clear that beyond the initial contact with the FBI that McDougall was instructed to initiate in early 2016, he continued to work cooperatively with the Government during the course of the audit. McDougall's numerous meetings and communications with the Government went beyond what was necessary from an objective standpoint to ensure that no work was duplicated but the LLA had also expressed concern with inadvertently interfering in the federal criminal investigation. The Court is not persuaded that McDougall altered the manner in which the audit was conducted in order to assist the Government, even though McDougall knew as early as February 2016 what the focus of the federal investigation would be. Again, the Court found credible McDougall's testimony regarding why the private NOPLF funds received the attention that they did in the audit. The audit in this case did not evolve into a criminal investigation as it moved forward notwithstanding the escalating level of entanglement between McDougall and the Government.

McDougall's efforts in conducting the audit were welcomed by the Government. There is no evidence, however, that anyone with the Government requested McDougall's assistance or asked him to alter the subject areas of his audit in any manner to assist with the federal investigation. There is no evidence that the Government affirmatively sought to control or direct the course of the audit. And

because McDougall credibly explained from an auditing perspective why it was necessary to delve into the NOPLF funds, the Court does not find that McDougall took it upon himself to alter the course of the audit in order to assist the Government. Simply, the fact that the LLA, whose jurisdiction is premised on public funds, included the NOPLF funds in the audit does not raise an inference that either the Government steered the course of the audit or that McDougall (even if not asked or encouraged to do so) modified the permissible scope of the audit in order to assist the Government. Surely Defendants' argument in this vein would have had more weight if no commingling of funds had occurred but having extensively commingled public and private funds in the operation of NOJO, Defendants cannot now complain that the scope of the audit was broader than necessary.[3]

### 1. Oral Statements

Even though McDougall interviewed a multitude of persons in conjunction with the audit, he only recorded conversations with Defendants, and he knew when he did so that they were under federal investigation. There is no evidence that the FBI or anyone with the United States Attorney's Office asked or encouraged McDougall to either interview Mayfield and Markham or secretly record the conversations. Of course, it would not have taken an affirmative indication from the Government to know that secretly recording two individuals who were the targets of a federal investigation might interest the Government. But McDougall explained at the hearing why he interviewed

---

[3] The Court wishes to emphasize that nothing in the documents submitted to the Court for in camera inspection impugns the conclusions that the Court has reached regarding how the audit was triggered and how the audit was conducted.

both Defendants, why he recorded the interviews, and why he did not tell Defendants he was recording them. The LLA left it to the discretion of an employee in McDougall's position whether to record conversations. McDougall decided on his own to record Mayfield and Markham.

Per *Caldwell*, if Defendants can prove that material misrepresentations regarding the nature of the inquiry (the audit) were made to them, and that because of those misrepresentations they consented to participate in the interviews with McDougall, then the evidence elicited from Defendants at those interviews would be inadmissible. 820 F.2d at 1399. The showing that McDougall used fraud, trickery, or deceit to obtain the interviews, *i.e.*, that he made material misrepresentations about the nature of the inquiry, must be made by clear and convincing evidence. *Id.* (citing *United States v. Prudden*, 424 F.2d at 1033). Defendants' suppression burden under the *Caldwell* analysis is a heavy one. *United States v. Powell*, 835 F.2d 1095, 1099 (5th Cir. 1988).

In analyzing the admissibility of the statements it is important to remain mindful that the mere failure to warn that the investigation may result in criminal charges is not fraud, trickery, and deceit. *United States v. Knight*, 898 F.2d 436, 438 (5th Cir. 1990); *Carriles*, 541 F.3d at 355 (citing *Blocker*, 104 F.3d at 729 & n.11). And silence can only be equated with fraud when there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading. *Prudden*, 424 F.2d at 1032.

Defendants' contention that they had no reason to suspect that McDougall was cooperating with the Government, and had they known he was doing so they would not have consented to speak with him, may be true but that does not render their statements inadmissible under the jurisprudence. McDougall had no duty to inform

Mayfield and Markham that the audit had been triggered by a complaint from the MCC or that criminal charges could result from the audit. *Powell*, 835 F.2d at 1099; *Prudden*, 424 F.2d at 1032-33. Likewise, McDougall had no duty to divulge to Mayfield and Markham that he was cooperating with the federal criminal investigation as the civil audit moved forward. *Carriles*, 541 F.3d at 356-57 (recognizing that the government is under no general obligation of disclosure). Because McDougall had no legal duty to speak, his reticence as to these issues cannot be considered fraud, trickery, or deceit.

With this backdrop in mind, the Court turns its attention to whether Mayfield and Markham have shown by clear and convincing evidence that McDougall made material misrepresentations about the nature of his inquiry. If this showing is made, then the Court must determine whether Defendants have established that it was because of those misrepresentations that they consented to participate in the interviews.

### a. *Markham's September 14, 2016 Interview*

Markham has the burden of showing by clear and convincing evidence that McDougall made material misrepresentations about the nature of the audit *prior* to the September 14, 2016 interview.[4]

McDougall's first contact with Markham was on August 11, 2016 by phone so that McDougall could set up a meeting with Markham. (Rec. Doc. 144-2, Calendar at 2). At the hearing McDougall explained that in a typical audit he would do an entrance conference and an exit conference with key personnel at the auditee organization. At Markham's request, McDougall emailed (on 8-11-16) the conference request to him,

---

[4] The Court emphasizes *prior* because any misrepresentations made after the interview could not have affected Markham's decision to consent to speak with McDougall on September 14, 2016.

and McDougall indicated in that email that the purpose of the meeting would be to

"discuss the nature, objectives and scope" of the NOJO audit. (Government Exhibit 1).

**Markham responded (on 8-11-16):**

May I ask what the nature of this request is? It's not stated in your email. I can only assume that's [sic] these requests are targeted for specific reasons, and I'm also assuming that I have the right to ask and be informed as to the specific reasons your office is contacting me to release information.

**McDougall responded (on 8-11-16):**

Please feel free to ask any questions and I will go into further detail during our meeting on Monday. As for the nature of our request, our section conducts audits based on requests, complaints, and just about any type of information that is received by our office. Due to this, when we begin a project we conduct a brief review of financial information from several to all areas of the agency. This allows us to determine if the information we received is accurate, if further work is necessary or if there is even a need for an audit.

**Markham responded (on 8-11-16):**

I'm certain your selection process is far more targeted than that. Hopefully, I'll learn more when we meet. In advance of any expectations, I am not permitted to turn over any information that isn't public without review and sign off from NOJO's legal counsel and our finance committee. I'll get back to you once I discuss this matter internally.

**McDougall responded (on 8-11-16)** by referring to the statutory scheme

governing the audit and added:

In addition, if you have any concerns regarding your agency's records, the above Revised Statutes also provide that our workpapers are confidential and exempt from public records requests.

(Government Exhibit 1).

Pretermitting consideration of McDougall's statement regarding confidentiality,

the Court discerns no material misrepresentations in the above quoted email exchange.

In addition to this preliminary email exchange, the LLA's Calendar has an entry on August 22, 2016 indicating that McDougall and Markham spoke on the telephone and that Markham said he had questions about the scope of the audit. (Rec. Doc. 144-2, Calendar at 2). The text entry that McDougall entered into the Calendar includes the notation that "BLM [McDougall] said the scope encompasses NOJO's use of public funds."

Markham argues that this text entry demonstrates that McDougall mispresented the scope of the audit to him during the pre-interview August 22nd phone conversation because the audit was not limited solely to public funds. This phone conversation was not recorded so the specifics and nuances of what McDougall actually said to Markham cannot be analyzed. But the Court finds that the text entry lacks probative value for at least two reasons. First, the statement is true facially, and as written it does not imply an assurance that McDougall would *only* be looking at public funds or that under no circumstances would he look at private funds. Although the Audit Plan dated August 10, 2016 indicates that some review of the NOPLF funds would take place, it is not clear that McDougall knew as of the time of the August 22nd phone conversation the extent of the commingling of funds that had occurred, and therefore that it would become necessary to examine at length the NOPLF transfers.[5]

Second, the best evidence of any misrepresentations regarding the nature of the audit leading up to the September 14, 2016 interview is found in both the emails between Markham and McDougall that are quoted above and in the recorded

---

[5] *See* note 6, *infra.*

conversation itself. The emails capture at least part of what McDougall told Markham about the audit going into the interview, and the recording captures exactly what McDougall told Markham about the audit when they met in person for the interview, which is when consent was given. The Calendar indicates that McDougall and Markham spoke by phone two other times prior to the September 14th interview but there has been no suggestion that McDougall made misrepresentations in those other conversations.

At the evidentiary hearing Markham's counsel attempted to introduce into evidence a collection of Markham's emails from the days leading up to the interview and then the days following the interview. (Markham's proffered Exhibits A-C). Markham sought to introduce these emails to demonstrate his present sense impression of the scope of the LLA audit around the time of the September 14, 2016 interview. The Court sustained the Government's objection to the emails and Markham was allowed to proffer the emails for appeal purposes. (Hearing Transcript at 282).

The Court has reviewed Markham's proffered emails and only one of them was received from McDougall prior to the interview. That email simply confirms the date and time of the interview meeting. It contained no misrepresentations of any kind. The only other email in the collection from McDougall was sent *after* the meeting to one of NOJO's accountants (Mr. Falgoust). An email that was sent *after* Markham had already consented to the interview is irrelevant. The Court found nothing helpful to Markham's position in the proffered pre-interview emails because Markham's present sense impression of the scope of the LLA audit is irrelevant unless it was informed by material

misrepresentations made by McDougall or someone else at the LLA. The emails contained no such evidence.

On September 14, 2016, McDougall met with Ronald Markham for about 30 minutes. McDougall secretly recorded the conversation. Near the beginning of the conversation **Markham** asked:

> Can I ask a . . . I am sorry to interrupt. You might not even answer these questions. Outside of, and I understand about the general scope of, you guys audit things, things that are more targeted than that. What are you looking for? And why my organization? And I am happy to comply.

**McDougall** replied:

> Sure. Well, specifically we're not looking for anything specifically, you know, that I can go into details of, but one of the things about what our section does, is, we get assigned projects by our management. We don't pick and choose what we are given. The basis for them, sometimes we know, sometimes we don't. I don't particularly know the base of this was . . .

**Markham** asked: "Would you tell me if you did?"

**McDougall replied:**

> I would. If I knew what it was. Even if I had a real good idea, I should say, but as for this, we were assigned a project because we just finished our last one.

At the hearing McDougall admitted that his answers to these questions were not truthful because he knew that the audit had been triggered by the MCC complaint.

Later during the same interview the following exchange occurred:

**Markham:**    "And it goes without saying that this information is confidential?"

**McDougall:**  "Absolutely. All our work papers . . . ."

**Markham:**    "Okay"

**McDougall:**  "Information that we obtain, it's all confidential. It's not subject to public records request . . . none of that. So essentially, the only [way] that

anybody can get access to our work files is through a subpoena and for the most part, they usually fight the [unintelligible]."

(Rec. Doc. 144-5, Transcript at 11)

Even though the Government had not yet served the LLA with a grand jury subpoena, McDougall knew when he answered this last question that the policy of the LLA was to honor (not fight) law enforcement subpoenas. Thus, McDougall knew when he answered Markham's question about confidentiality that everything that NOJO produced in conjunction with the audit eventually would be turned over to the Government pursuant to a subpoena.

The Court credits McDougall's characterization of this interview as an entrance conference typical of the kind conducted in an audit.[6] Under state law the LLA can call upon the auditee to assist with the audit, La. R.S. § 24:513(E). The subject matter covered in this interview, which did not include the private NOPLF funds, supports McDougall's characterization of the meeting, which also included NOJO's accountant. Markham might have preferred to decline to be interviewed if he had known that McDougall was cooperating with the Government and that all of the audit materials would eventually find their way to the Government. But NOJO was required by state law to participate in the audit and to assist with it. No one has suggested that Markham was not the appropriate corporate representative to interview for the entrance conference.

_____

[6] Although McDougall had already done some preliminary work on the audit by the time of the entrance interview, the LLA's audit plan was only confected on August 10, 2016 (Rec. Doc. 162-2). Even though the MCC's complaint had been submitted to the LLA in June 2015, there were gaps spanning months at a time in the Calendar near the beginning of the audit. McDougall testified that he did not ask the pointed questions at this interview because he just did not know enough at the time.

The facts surrounding this interview do not raise a plausible inference that McDougall chose Markham to interview in order to assist with the federal investigation, much less that the Government asked McDougall to interview Markham.[7]

The Court does not find that the admittedly untruthful statements that McDougall made to Markham at the beginning of the interview constituted material misrepresentations about the nature of the audit. Telling Markham that he did not know the reason for the audit, and dissembling when Markham asked him what he was looking for in the audit, were not misrepresentations about the nature of the audit, much less material ones.

Likewise, the statements regarding confidentiality did not constitute material misrepresentations about the nature of the audit. McDougall told Markham that the only way that anyone could get the LLA's workpapers was via a subpoena. This is a true statement. It is likewise true that the LLA for the most part moves to quash subpoenas. McDougall's statement clearly left open the possibility that the LLA does not resist all subpoenas. That McDougall conveniently failed to add that the LLA would not fight a subpoena from the Government renders his answer incomplete but not untruthful.

In sum, Markham has not shown by clear and convincing evidence that McDougall made material misrepresentations about the nature of the LLA audit prior to or during the September 14, 2016 interview so as to vitiate his consent to be

_____

[7] In fact, it was not until almost a year later that Agent Lantto emailed McDougall to request a copy of the interview recording. (Rec. Doc. 144-9, 10/10/17 email). Lantto did not know until some time after the interview that it had been recorded.

interviewed by McDougall. The motion to suppress is DENIED as to the September 14, 2016 statement.

### b. Markham's October 19, 2017 Interview

McDougall met with Markham on October 19, 2017, and he once again recorded the conversation without Markham's knowledge. By the time that the second interview took place the Government had served its subpoena on the LLA (on October 5, 2016) and the LLA was regularly producing materials obtained in conjunction with the NOJO audit to the Government. McDougall knew that the recording of this interview would also be turned over to the Government because Agent Lantto had requested just days before the recording from the September 14, 2016 interview. This second interview, which lasted over two hours, was more concerning to the Court because the NOPLF funds were discussed at length during the interview and by the time it took place McDougall had had numerous contacts with the Government. During the interview, as McDougall segued into the discussion of NOPLF, he stated:

> And so you know, kind of looking at that . . . and I really, you know, I understand **the Library Foundation money is not public it was not something that we were looking at.** But, in just reading some of the news articles that came out, you had mentioned, I think it was in the interview you did with Hammer, is that his name? . . . You had talked about some of the Library Foundation money being used at the Jazz Market. What was that used on?

(Rec. Doc. 144-12, Transcript at 20) (emphasis added).

From that point forward McDougall questioned Markham extensively about the NOPLF funds.

At the outset the Court notes that by the time that this second interview took place Markham knew without question that NOJO was the subject of a federal criminal

investigation because FBI agents had already come to his home to deliver a grand jury subpoena that sought from him *inter alia* documents pertaining to the NOPLF and to question him (on August 24, 2017). By the time of the second interview with McDougall, Markham had already responded to the grand jury subpoena (on October 10, 2017). All the while a tenacious investigative reporter had been publishing articles about Defendants' activities with NOJO and the NOPLF. It is undisputed that the agents did not inform Markham that he was a target of the federal investigation but Markham is not an unsophisticated individual.

McDougall credibly explained at the hearing why he asked to interview Markham a second time and why he asked so many questions about the NOPLF funds. In light of the significant overlap in expense reimbursements that the audit had uncovered by that time, McDougall's questions regarding the NOPLF were relevant to the NOJO audit, *see* La. R.S. § 24:513(E) (regarding assistance from the auditee), and did not go beyond what was necessary to conduct a bona fide examination as allowed by state law. *See Carriles*, 541 F.3d at 358-59. As with the first interview there is no evidence that the Government asked McDougall to conduct this interview, record it, or question Markham about the NOPLF funds. And as with the first interview, no one has suggested that Markham was not the appropriate principal to answer McDougall's questions, with the possible exception of Mayfield himself given that many of the questions pertained to reimbursements related to Mayfield's expenses. McDougall called Mayfield the next month.

Markham contends that the emphasized statement in the quotation above is a material misrepresentation about the nature of the audit because McDougall *was*

looking at the NOPLF funds as part of the audit. It is certainly plausible that McDougall tried to de-emphasize the LLA's interest in the NOPLF expenditures so that Markham would speak freely with him about the NOPLF funds during the October 19, 2017 interview. But the questions were legitimately within the scope of the NOJO audit. Even if the statement could be considered a material misrepresentation about the nature of the audit, it is implausible that Markham relied on the statement when he consented to answer McDougall's questions. Given the length at which McDougall pursued the NOPLF transfers during the discussion Markham could not have reasonably believed that the LLA had no interest in those funds. Again, Markham is a sophisticated individual.

The transcript of the October 19, 2017 interview persuades the Court that if Markham's consent to answer the NOPLF questions during that meeting was obtained by trickery or deception,[8] it derived only from McDougall's duplicitousness in acting friendly and folksy with Markham all the while knowing the peril that Markham faced in light of the federal criminal investigation—an investigation with which McDougall was cooperating. But friendliness and cordiality, even if insincere, do not rise to the level of fraud, trickery, or deceit so as to support the exclusion of evidence. *See Prudden*, 424 F.2d at 1034.

---

[8] That Markham's willingness to consent to the interview in hindsight might have been ill-advised does not mean that he consented to the interview due to trickery. Markham's willingness to answer McDougall questions could have also been calculated to dispel McDougall's concerns about the NOPLF funds or to help persuade him to see the results of his investigation in the most favorable light to Markham. *See Prudden*, 424 F.2d at 1034.

In sum, Markham has not shown by clear and convincing evidence that McDougall made material misrepresentations about the nature of the LLA audit so as to vitiate his consent to be interviewed by McDougall on October 19, 2017 or to answer McDougall's extensive questions regarding the NOPLF funds. The motion to suppress is DENIED as to the October 19, 2017 statement.

### c. Mayfield's November 15, 2017 Interview

On November 15, 2017, McDougall cold-called Mayfield on his cell phone and they spoke at length. (Rec. Doc. 162-1 Exhibit Q). The two had never spoken before. McDougall secretly recorded that conversation. This was the only time that McDougall interviewed Mayfield.

By the time that McDougall called Mayfield, both he and Markham had been served with grand jury subpoenas and the FBI had questioned Markham at his home. By the time of this interview Mr. Goyneche had spoken to the media about the MCC's complaint and the LLA audit. Mayfield may very well have had no reason to suspect that McDougall was cooperating with the federal criminal investigation when he agreed to be interviewed, but he knew nonetheless that he was the target of a federal criminal investigation. In fact, Mayfield was represented by counsel by the time McDougall called him.

Unlike Markham, Mayfield did not engage in email colloquies with McDougall leading up to this phone call so the source of any misrepresentations pertinent to the *Caldwell* analysis must necessarily come from the phone conversation itself. Mayfield contends that he would not have consented to the phone call with McDougall—and to giving the surreptitiously recorded statement—had McDougall not made certain

misrepresentations during the conversation. Mayfield contends that McDougall lied to him about both the nature and scope of the audit.[9]

The first alleged misrepresentation that Mayfield identifies is when at the beginning of the call McDougall stated that "what I'm looking at is the use of public funds at the Jazz Orchestra." (Rec. Doc. 162-1, Call transcript at 1). But this is a truthful statement. It does not foreclose the possibility that other non-public funds might be included in the audit. And if Mayfield had interpreted the statement as such an assurance then he likely would have terminated the call and declined to answer any of McDougall's questions regarding the private NOPLF funds, which he was entitled to do once he discerned that McDougall's questions were inconsistent with this assertion.[10]

Near the end of the call, **McDougall** stated:

"And I'll tell you this, I told Ron the same thing, I am not concerned about, you know, any of the stuff regarding the public library foundation other than, you know, identifying if it affected or was affected by the public funds in any way. Meaning, you know . . .

* * *

That's the, from our perspective at this office, that's a civil matter, you know, that needs to be handled through civil litigation with the Jazz Orchestra and the Library Foundation already took care of. So . . . .

---

[9] The Court has no doubt that Mayfield would not have spoken to McDougall if he had known that McDougall was cooperating with the Government. Mayfield was represented by counsel and unlike Markham he had never agreed to speak with the FBI or the press.

[10] At the very beginning of the call Mayfield confirmed with McDougall that Markham had answered "100% of all the questions that [McDougall] asked." (Rec. Doc. 162-1, Call transcript at 2). McDougall confirmed that Markham's answers were not incomplete. (*Id.*). One would therefore assume that NOJO had rendered all of the "assistance" with the audit that was required under state law, *see* La. R.S. § 24:513(E), and that Mayfield had absolutely no obligation to speak with McDougall. McDougall never implied anything to the contrary. Rather, McDougall explained that he had questions about certain expenses that NOJO (presumably through Markham) had indicated were incurred due to Mayfield. (*Id.*). The inference to be taken away is that McDougall was giving Mayfield an opportunity to explain the questionable transactions.

(Rec. Doc. 162-1, Call Transcript at 24).

No party has questioned the accuracy of the call transcript. The call transcript is 24 pages long. The statements quoted above begin at the bottom of page 23 of the transcript and end on page 24. While the Court does not agree with Mayfield's contention that anything in the foregoing statements is untruthful, it remains that these statements occurred so near the end of the phone call—well after Mayfield had spoken with McDougall at length—that they cannot credibly be considered as something that Mayfield relied upon when choosing to consent to the interview.

Mayfield contends that McDougall misrepresented to him the prominence of Mayfield in the yet-unpublished LLA audit report. Mayfield points out that he was mentioned 44 times in the final report. During the conversation McDougall stated:

> Um, now, you know, what we do due to certain circumstances is if other people are specifically named in the report for, uh, things that they may want to respond to, you know, we'll usually send them a copy of the portions of the report that they're named in, that they may want to respond to and they'll have the opportunity to do it and have it published with the report or not. Um, and I'm not saying that that would be something that will happen with you. Right now, ***I haven't typed your name into any portion of my report whatsoever, other than the portion that says, you know, who incorporated the Jazz Orchestra. And so, um, you know, it could be a situation where, you know, I don't have anything to send you because outside of, you know, one or two things, you're not even named in the report.*** You know . . .

(Rec. Doc. 162-1, Call transcript at 22) (emphasis added),

This statement occurs on page 22 of the transcript, again after Mayfield had already spoken at length and consented to the interview. That aside, while this statement might be a misrepresentation it does not constitute a material misrepresentation regarding the nature of the audit.

Mayfield also contends that another misrepresentation is that McDougall failed to disclose to him, even after being asked, the serious legal ramifications of speaking with McDougall. As the Court explained above, McDougall had no duty to disclose to Mayfield that information obtained during the LLA audit would be shared with the Government. And McDougall had no duty to counsel Mayfield regarding the perils of speaking to anyone while under federal investigation. The call transcript belies that assertion that McDougall answered untruthfully when Mayfield did bring up the legal ramifications of the audit. (Rec. Doc. 162-1, Call transcript at 3).

Mayfield contends that during their conversation McDougall misrepresented the progress and status of the audit, essentially playing naïve and telling Mayfield that he was only at the beginning stages of his investigation. (*Id.* at 5). While this statement was a misrepresentation it does not constitute a material misrepresentation regarding the nature of the audit.

Mayfield points out that at the beginning of the conversation with McDougall he was disinclined to speak with McDougall and he even mentioned that he was represented by an attorney. This is correct. In fact, Mayfield was very circumspect and suspicious of McDougall's cold-call and even somewhat combative. But McDougall did essentially nothing to persuade Mayfield to talk to him and he did not lie to Mayfield to keep him on the phone. The transcript of the conversation speaks volumes and it makes clear that Mayfield stayed on the phone and spoke voluntarily at length to McDougall to explain his role in the NOJO matters. It is obvious from the transcript that Mayfield is a garrulous individual, and it was Mayfield who did most of the talking and questioning

during the lengthy conversation. It was Mayfield for the most part, not McDougall, who guided the conversation.[11] (Rec. Doc. 162-1 Exhibit Q).

The transcript of the November 15, 2017 interview persuades the Court that the only trickery or deceit involved in convincing Mayfield to talk to McDougall was McDougall's duplicitousness in acting friendly and cordial with Mayfield all the while knowing that he would turn over everything to the Government and McDougall's lack of candor at times. McDougall did downplay his interest in the NOPLF expenditures but in doing so he did not make any material misrepresentations about the nature and scope of the LLA audit.

In sum, Mayfield has not shown by clear and convincing evidence that McDougall made material misrepresentations about the nature of the LLA audit so as to vitiate his consent to be interviewed by McDougall on November 15, 2017 or to answer McDougall's questions regarding the NOPLF funds. The motion to suppress is DENIED as to the November 15, 2017 statement.

As to both Defendants, the nature of the inquiry (audit) was exactly what McDougall represented it to be. It was a civil audit conducted in accordance with state law. The LLA's jurisdiction is premised on public funding and appropriate use of public funds is the primary interest of the LLA. But the state statutory scheme allowed for the examination of private funds when commingled with public funds, which had occurred in this case. McDougall's cooperation with the Government, which did not affect the

_____

[11] The Court observes that Mayfield's willingness to speak with McDougall at length, even after learning that Markham had already answered all of McDougall's questions, could have been a calculated effort to dispel McDougall's concerns about the NOPLF funds or to help persuade him to see the results of his investigation in the most favorable light to Mayfield.

manner in which McDougall conducted the state audit, did not transform it into a federal criminal investigation.[12]

### d. Defendants' Rule 26.2 Objections

Defendants move the Court to reconsider its denial of their request for witness statements pursuant to Federal Rule of Criminal Procedure 26.2, which applies at a suppression hearing. Fed. R. Cr. Pro. 26.2(g). At the evidentiary hearing Defendants moved for witness statements after McDougall and Agent Lantto testified. The Government confirmed that it had no such statements beyond what was included in the Government's in camera production of materials responsive to the document subpoenas that Defendants issued before the evidentiary hearing.[13] That in camera production is discussed below.

### 2. Motion to Reconsider

Defendants move the Court to reconsider its ruling quashing the document subpoenas that they issued to the United States Attorney's Office, FBI, and LLA in conjunction with the evidentiary hearing. (Rec. Doc. 216, Minute Entry). The Court was persuaded that the subpoenas should be quashed because they sought discovery

---

[12] The Court notes that secretly recording anyone is a disdainful and odious practice. Although this Court has significant misgivings and personal disappointment of the surreptitious taping of Markham and Mayfield by the state official, as stated earlier, this type of behavior does not violate the Fourth, Fifth, or Sixth Amendments to the United States Constitution under the facts of this case. One of the Assistant United States Attorneys in this case even conceded at oral argument that McDougall's actions might appear "unseemly." But that does not mean that the statements gathered are inadmissible.

[13] After the hearing the Government supplemented the in camera production in light of the Rule 26.2 requests. (Hearing transcript at 287).

materials, not materials that were evidentiary in nature. The Court remains persuaded on this point.

The Court has reviewed the in camera production from the Government, which includes all responsive documents in the possession of the United States Attorney's Office and the FBI, and the LLA's production of documents responsive to the subpoenas. The documents contain nothing that impeaches the testimony of any witness that testified at the hearing. The documents contain nothing to contribute to the showing that Defendants must make under *Caldwell*. But most importantly, the Court is persuaded that Defendants were not prejudiced in their ability to participate effectively in the evidentiary hearing because Defendants already knew from the Government-produced discovery exactly what questions they needed to ask at the hearing. This was not a situation where Defendants needed to review the subpoenaed documents to know what to ask the witnesses. Defendants had a firm theory going into the hearing. All of their testimonial subpoenas were honored and Defendants were allowed to question the witnesses at length in order to make their case. The Court remains persuaded that quashing the subpoenas was appropriate, and to the extent that it was not, Defendants suffered no prejudice. The motion to reconsider is DENIED.[14]

Accordingly, and for the foregoing reasons;

---

[14] At the conclusion of the evidentiary hearing the Court granted the defense motion to maintain the in camera documents under seal so that they will be part of the record in this case. (Hearing transcript at 283). The documents have been provided to the Clerk with instructions to scan them and file them in the record under seal as attachments to this ruling.

**IT IS ORDERED** that the **Motion to Suppress and Request for Evidentiary Hearing (Rec. Doc. 144)** filed by defendant Ronald Markham and joined by defendant Irvin Mayfield is **DENIED**.

**IT IS FURTHER ORDERED** that the **Motion to Reconsider (Rec. Doc. 220)** filed by Defendants is **DENIED**.

November 12, 2019

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE